IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

INNOVATIVE THERAPIES, INC.     :

    :

    v.     :     Civil Action No. DKC 12-3309

    :

MARK S. MEENTS     :

    :

**MEMORANDUM OPINION**

Presently pending and ready for review in this declaratory judgment action are several motions, including: (1) the motion of Plaintiff Innovative Therapies, Inc. ("ITI" or "Plaintiff") for a protective order (ECF No. 21); (2) Plaintiff's motion to modify a subpoena (ECF No. 24); (3) the motion of Defendant Mark S. Meents ("Meents" or "Defendant") for extension of time to complete discovery (ECF No. 27); and (4) Plaintiff's motion for partial summary judgment (ECF No. 35). The issues have been fully briefed, and the court now rules, no hearing being deemed necessary. Local Rule 105.6. For the following reasons, Plaintiff's motion for partial summary judgment will be denied. Plaintiff's motions for a protective order and to modify a subpoena will be granted in part. Defendant's motion for an extension of time to complete discovery will be granted in part.

## I. Background

ITI is a Delaware medical device company specializing in advanced wound care that was founded in 2005 by Richard Vogel ("Vogel") and Dr. Paul Svedman. (ECF No. 1 ¶ 5). Meents joined ITI in late 2006. (*Id.* ¶ 6). On October 15, 2007, Meents was elected to ITI's Board of Directors as ITI's Vice President. He received 4,000 shares of ITI's non-voting Class A common stock in connection with his employment with ITI. (*Id.* ¶ 7). Meents executed a Shareholders Agreement with ITI in 2007. (ECF No. 1-6).[1] The Shareholders Agreement states that any shareholder may be terminated "for adequate cause." (ECF No. 1-6, at 15). Under Section 1.10, "adequate cause" includes the following:

> (d) a Shareholder fails to perform his duties in a competent manner; (e) a Shareholder violates his duties of confidentiality and/or non-compete clauses under this Agreement; (f) a Shareholder commits any material act or acts which harm the Company's reputation, standing, or credibility within the community(ies) it operates or with its customers or suppliers; and (g) a Shareholder fails to perform the duties assigned him in a material manner for whatever reason.

(*Id.*). Section 1.10 also stipulates that "[i]n the event that a Shareholder is terminated for adequate cause, the terminated Shareholder shall forfeit his stock." Section 1.9 states that

---

[1] The Shareholders Agreement is dated October 15, 2007, but there is some dispute about the exact date when the shareholders executed this document. (*See* ECF No. 1-6).

"[i]f a Shareholder voluntarily retires or resigns without meeting the requirements of Section 1.8.1., he shall forfeit his [s]tock." (*Id.*). Section 1.8.1. contains the following provision:

> Provided that the retired Shareholder has provided the Company and the remaining Shareholders with six (6) months notice, the Company shall have forty-five (45) days from such Notice in which to elect to buy all or any of the retiring Shareholder's shares of Offered Stock at the Agreement Price in accordance with the provisions below. In the event that the Company fails to purchase any or all of the Offered Stock, each Shareholder shall have fifteen (15) days from the expiration of the Company's option period described in this Section 1.8.1. in which to buy such remaining shares of the Offered Stock at the Agreement Price in proportion to his respective ownership of the Stock (excluding the Offered Stock), or in such other proportion as the remaining Shareholders shall agree upon in writing, and in accordance with the provision below.

(*Id.* at 13-14).

ITI designated Meents as its Chief Operating Officer ("COO") on July 1, 2009 and the parties entered into an Employment Agreement memorializing this relationship on June 10, 2010. (ECF No. 1-4). Article III.C of the Employment Agreement governs termination for cause, and states that "[i]f ITI terminates your employment for [c]ause . . . you shall be entitled to no compensation or benefits from ITI other than those earned." (*Id.* at 3). Article III.C explains that a

termination "for cause" occurs if ITI terminates employment for any of the following reasons:

> theft, dishonesty, or falsification of any employment or ITI records; . . . your consistent poor performance, as determined by your supervisor, in their sole discretion; your improper use or disclosure of ITI's confidential or proprietary information; any intentional act by you that has a material detrimental effect on ITI's reputation or business; or any material breach of the terms of this letter agreement by you, which breach is not cured within thirty (30) days following written notice of such breach from ITI.

(*Id.*).

On April 15, 2011, Meents's title changed from COO to Vice President of Marketing. Plaintiff alleges that as COO, Mr. Meents "failed to meet previously established goals and objectives while overbuilding ITI's rental assets and placing ITI in financial distress." (ECF No. 1 ¶ 15). Meents's alleged demotion was announced at a staff meeting, during which Vogel explained that "only their longstanding professional relationship had prevented Meents' prior termination for poor performance." (*Id.*). Then, in September 2011, Meents became Vice President of Sales Operations, "a position primarily concerned with the integration of ITI's sales and billing systems." (*Id.* ¶ 16). Creed Russon ("Russon"), Meents's former subordinate, supervised Meents in this new role. ITI allegedly informed Meents that "his latest demotion was a last and final

4

attempt to salvage his ongoing employment with ITI." (*Id.* ¶ 17).

As Vice President of Sales Operations, Meents was tasked with the oversight and implementation of a website that would allow ITI's customers to place orders. According to Plaintiff, "Meents consistently missed deadlines, exceeded his projected budget, and was unable to work with his peers to develop the web-based system. Instead, Meents attempted to implement his own system, which produced inaccurate data and failed to meet the needs of ITI and its customers." (*Id.* ¶ 18).

Meents submitted a resignation letter, dated April 16, 2012, in which he stated:

> Due to a variety of personal reasons, I am giving my six-month notice of resignation to the company effective October 31, 2012. *The effective date of my resignation is per the requirement of section 1.8.1 of the Shareholder's Agreement dated 10/16/2007.* The Shareholder's Agreement in section 1.8.1 states that I provide this same notice to all other shareholders. Therefore, I am sending this letter to the shareholders copied below who are part of the Shareholders Agreement.

(ECF No. 1-8) (emphasis added). On July 5, 2012, Meents sent the following email to Vogel:

> I would like to pursue the sale of my ITI stock. While I realize the time has elapsed for the company or shareholders to purchase, I thought I would ask if there is any interest from inside ITI before pursuing someone outside the company. If there is no

> internal interest, I will need a method to
> value my stock to an outside investor.

(ECF No. 36-10).  In that email, Meents also asked for access to the following documents that he thought would assist him in valuing his shares of stock: last three years' financials; incorporation documents including Articles of Incorporation and by-laws.  (*Id.*).  On July 10, 2012, Meents met with Vogel, David Tumey ("Tumey"), another shareholder at ITI, and Russon to discuss this email.  Meents sent this follow-up email on July 19, 2012 to Vogel, Tumey, and Russon:

> After some thought, I would like to again
> request the information previously requested
> in that email so I can make a determination
> on whether or not to pursue the use of an
> appraiser.  Mentioned in the original email
> were the last three years financials,
> incorporation documents including Articles
> of Incorporation and by-laws, etc.  In
> addition, to determine the individual share
> price, I will need the number of shares
> issued.

(ECF No. 36-11).

Shortly thereafter, ITI decided to terminate Meents.  On July 31, 2012, Russon called Meents while he was on vacation in Paris and read the following termination letter to Meents:

> Due to your consistently poor performance
> which is not in the best[] interests of the
> company, and for knowingly ordering a
> subordinate to forge the Corporate
> Controller's signature on a check, we hereby
> give you notice of termination for cause and
> adequate cause pursuant to your Employment
> and Shareholders Agreements.

(ECF No. 1-9).[2]  Then, on August 1, 2012, Meents received a

letter from Vogel informing him that he must forfeit his stock

because he was terminated for cause:

> This letter is notification that, as a
> consequence of your termination for adequate
> cause by Innovative Therapies, Inc., your
> 5,500 shares of Class A Common Stock
> (Certificates A-1 and A-21) are forfeited in
> accordance with section 1.10 of the
> Shareholders Agreement.

(ECF No. 36-15).

Subsequently, Meents initiated a shareholder derivative

action against Vogel in the Circuit Court for Montgomery County

on October 4, 2012, captioned *Innovative Therapies, Inc. v.

Richard Vogel*, No. 369279V.  ITI then filed the instant

complaint on November 12, 2012 seeking, *inter alia*, a

declaratory judgment that Meents was terminated for cause and

for adequate cause and consequently, has forfeited his shares of

ITI stock.  (ECF No. 1, at 7).  On December 17, 2012, Meents and

Vogel agreed to enter a consent order in the state court

derivative action that stayed all proceedings pending the

disposition of this lawsuit.  (ECF No. 21-2, at 84).  Meents's

---

[2]  ITI allegedly discovered that on June 2, 2010, "Meents
knowingly ordered Susan Sullivan, ITI's Office Manager, to forge
ITI's Corporate Controller's signature on a company check."
(ECF No. 1 ¶ 19).

standing to maintain a shareholder derivative action is contingent on the outcome of the instant dispute.

Meents answered the complaint on December 20, 2012. (ECF No. 7). Meents filed a counterclaim on the same day, (ECF No. 8), and Plaintiff moved to dismiss the counterclaim on January 24, 2013 (ECF No. 11). The undersigned issued a memorandum opinion and order on June 12, 2013, dismissing Meents's counterclaim without prejudice to his right to file an amended counterclaim within fourteen (14) days. (ECF Nos. 17 & 18).[3] Meents did not file an amended counterclaim. A scheduling order was entered on June 12, 2013, setting October 25, 2013 as the close of discovery date. (ECF No. 19). ITI moved for a protective order (ECF No. 21), Meents responded (ECF No. 22), and ITI replied (ECF No. 23). ITI also moved to modify a subpoena issued to Bank of America, N.A. (ECF No. 24), and Meents opposed the motion (ECF No. 25). On October 24, 2013, one day before the close of discovery, Meents moved for an extension of time to complete discovery (ECF No. 27), ITI responded (ECF No. 31), and the undersigned issued an order deferring ruling on this motion pending adjudication of Plaintiff's two motions (ECF No. 33). ITI then moved for

---

[3] The undersigned concluded that Meents's counterclaim mirrored the causes of action asserted in Counts VI-VII of the state court action, was exclusively derivative in nature, and failed to comply with Fed.R.Civ.P. 23.1. (*See* ECF No. 17).

partial summary judgment (ECF No. 35), and Meents opposed the motion (ECF No. 36). After the undersigned granted several extensions of time to file a reply, Plaintiff submitted a reply brief (ECF No. 43).

## II. Analysis

### A. Plaintiff's motion for partial summary judgment

### 1. Standard of Review

Summary judgment may be entered only if there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law. Fed.R.Civ.P. 56(a); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); *Emmett v. Johnson*, 532 F.3d 291, 297 (4th Cir. 2008). Summary judgment is inappropriate if any material factual issue "may reasonably be resolved in favor of either party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986); *JKC Holding Co. LLC v. Wash. Sports Ventures, Inc.*, 264 F.3d 459, 465 (4th Cir. 2001).

"A party opposing a properly supported motion for summary judgment 'may not rest upon the mere allegations or denials of [her] pleadings,' but rather must 'set forth specific facts showing that there is a genuine issue for trial.'" *Bouchat v. Balt. Ravens Football Club, Inc.*, 346 F.3d 514, 522 (4th Cir. 2003) (quoting former Fed.R.Civ.P. 56(e)). "A mere scintilla of proof . . . will not suffice to prevent summary judgment." *Peters v. Jenney*, 327 F.3d 307, 314 (4th Cir. 2003). "If the

evidence is merely colorable,[] or is not significantly probative,[] summary judgment may be granted." *Liberty Lobby*, 477 U.S. at 249-50 (citations omitted). At the same time, the facts that are presented must be construed in the light most favorable to the party opposing the motion. *Scott v. Harris*, 550 U.S. 372, 378 (2007); *Emmett*, 532 F.3d at 297.

**2.    Partial Summary Judgment**

ITI argues that the court should enter partial summary judgment in its favor and declare that Meents's pretext defense is irrelevant to the issues in dispute. ITI attempts to preclude Meents from raising pretext as a defense to ITI's claim in Count I of the complaint, seeking a declaratory judgment that Meents was terminated for cause and thus should forfeit his shares of ITI stock.

Courts and juries generally should not interfere with business decisions. *Towson Univ. v. Conte*, 384 Md. 68 (2004). Specifically, *Conte*, 384 Md. at 85, held that in "good cause" contracts:

> The jury may not review whether the factual bases for termination actually occurred or whether they were proved by a preponderance of the evidence submitted for its review. Instead, the proper role of the jury is to review the *objective* motivation, *i.e.,* whether the employer acted in objective good faith and in accordance with a reasonable employer under similar circumstances when he decided there was just cause to terminate the employee. The *jury's inquiry should*

> *center on whether an employer's termination was based upon any arbitrary, capricious or illegal reason, or on facts not reasonably believed to be true by the employer.* But the fact-finding prerogative remains with the employer, absent some express intention otherwise.

(emphasis added). The court noted, however, that this rubric still demands an assessment of the "objective reasonableness" of the employer's factual determination that just cause existed. *Id.* at 88. Objective reasonableness of an employer's just cause determination requires that: (1) the employer act in objective good faith (meaning good faith from the perspective of a reasonable employer, not of the individual employer); and (2) that the employer base its decision on a reasoned conclusion supported by substantial evidence. *Id.*

ITI argues that Meents's termination was objectively reasonable. The Shareholders Agreement identifies forfeiture of stock – which is what ITI seeks - as a consequence of termination for adequate cause. Section 1.10 of the Shareholders Agreement states that "adequate cause" for termination includes the following:

> (d) a Shareholder fails to perform his duties in a competent manner; (e) a Shareholder violates his duties of confidentiality and/or non-compete clauses under this Agreement; (f) a Shareholder commits any material act or acts which harm the Company's reputation, standing, or credibility within the community(ies) it operates or with its customers or suppliers;

> and (g) a Shareholder fails to perform the
> duties assigned him in a material manner for
> whatever reason.

In the termination letter dated July 31, 2012, ITI stated that Meents would be terminated for his "consistently poor performance which is not in the best[] interests of the company, and for knowingly ordering a subordinate to forge the Corporate Controller's signature on a check." (ECF No. 35-6). ITI offers an affidavit from Richard Vogel, in which he explains that "[a]s ITI's Chief Operating Officer, Meents failed to meet previously established goals and objectives, while overbuilding ITI's rental assets and placing ITI in financial distress." (ECF No. 35-2 ¶ 6). Thus, ITI demoted Meents from COO to Vice President of Marketing on April 15, 2011. ITI asserts that Mr. Meents again was demoted in September 2011 to Vice President of Sales Operations, a position primarily concerned with the integration of ITI's sales and billing systems. According to ITI, as Vice President of Operations, Meents "consistently missed deadlines, exceeded his projected budget, and was unable to work with his peers to develop the Integrated System.[] Instead, Meents attempted to implement his own system, which produced inaccurate data and failed to meet the needs of ITI and its customers." (*Id.* ¶ 8). ITI believes that "due to Meents's ongoing incompetence, ITI nearly lost its largest client, the cash flow necessary to continue its operations, and required the

implementation of a functional system for billing and invoicing by an outside consultant." (*Id.* ¶ 10).

Meents challenges whether ITI's decision to terminate him was done in objective good faith from a reasonable employer's perspective under *Conte* and offers arguments to suggest pretext and that the decision was premised on arbitrary, capricious, or illegal reasons. For instance, ITI cited Meents's alleged ordering a subordinate to forge the Corporate Controller's signature on a check as one ground for termination. But as Meents points out, Vogel testified in his deposition that this alleged incident occurred on or about June 2, 2010, over two years preceding Meents's termination, and Vogel did not discuss this alleged incident with Meents until he was terminated. (ECF No. 36-13, at 12). Instead, on June 10, 2010, shortly after the alleged forgery, ITI executed the Employment Agreement with Meents, designating Meents as ITI's COO. This sequence of events undercuts ITI's position that the alleged forged check incident served as a good faith ground, from a reasonable employer's perspective, to terminate Meents.[4] Meents also disputes that the company suffered financially under his watch, attesting that "ITI's income grew from zero to more than half a

---

[4] Russon testified that although he recommended to Vogel that Meents be terminated, he was unaware of the alleged check forgery incident, and this was something that Vogel added to the termination letter.

million dollars in 2008, to more than $8 million in 2009, and to
[] more than $14 million in 2010 all while [he] was acting as
the chief operating officer of the company." (ECF No. 36-2 ¶
16). Although Vogel cites Meents's ongoing poor performance as
a basis for his termination, he testified in his deposition that
he did not consider terminating Meents before Russon brought it
to his attention in late July 2012, after Meents had already
resigned and submitted his six-month notice pursuant to the
Shareholders Agreement. (ECF No. 36-13, at 14).

Vogel also avers that due to Meents's ongoing incompetence,
ITI nearly lost its largest client, Select Specialty Hospitals.
But as Meents points out, this assertion is contradicted by
email exchanges between Larry Jones, Russon, and Vogel around
the time of Meents' termination, attributing problems to the
client's representative, Mary, who was generally unhappy with
the system. The emails do not suggest any performance
deficiencies by Meents. (*See* ECF No. 36-32, at 5-6 ("Not a
single conversation has taken place without [Mary] questioning
'when will you be back on Sentinel?'"; "If the decision is hers
to make, it will always remain that she needs all data presented
to her via the same platform (Sentinel)"; "Honestly, Mary will
not be happy until she can return to a system like Sentinel
where she does not have to do any analysis or follow up – for
which she does not have the staff (or temperament) to deal

with.")).   Moreover, although Russon allegedly recommended to
Vogel that Meents be terminated for his consistently poor
performance, Meents offers multiple email exchanges between
Russon and him in which Russon regularly complimented Meents's
work.  (*See* ECF No. 36-31 ("[y]ou're a good man Mark Meents";
"you don't miss much"; "Mark – Great job on tweaking the pricing
to reflect continuity and round numbers for each disposable";
"Mark – good response.").  Meents declares that "[a]t no time
during this period did [Russon] complain about my performance or
reprimand me in any way."  (ECF No. 36-2 ¶ 41).

     In *Conte*, 384 Md. at 85, the court observed that the
"inquiry should center on whether an employer's termination was
based upon any arbitrary, capricious or illegal reason, or on
facts not reasonably believed to be true by the employer."
Here, Meents asserts that ITI was motivated to terminate him
*after* Meents resigned and after his inquiries regarding
appraisal of his shares of ITI stock.  Meents contends that ITI
terminated him because he was on the verge of discovering
numerous improprieties at the company, including improper
issuance of excessive dividends to Vogel as compared to other
shareholders, improper assignment of ITI patents to Vogel
instead of ITI, and improper dealings between ITI and Geuritec
Holdings, Inc., a company in which Mr. Vogel had an ownership
interest.  (*See* ECF No. 36-2 ¶ 24 ("[i]n April, I only knew that

15

something was amiss about the stock, and I had also found out
that Vogel had done other things he would not have wanted an
appraiser reviewing the company's financial picture and its
business assets to discover.")). *See, e.g., Britton v. Tech.,
Automation & Mgmt., Inc.*, Civil No. JFM 08-536, 2008 WL 2477453,
at *4-5 (D.Md. June 16, 2008) (analyzing a contract providing
for termination for cause and concluding that plaintiff has pled
sufficient facts in support of his claim that defendant's
decision to terminate him for cause was arbitrary and
capricious, where plaintiff alleged that "Davis, to the
detriment of other shareholders, received excessive compensation
and interest free loans from TeAM; charged cars, country club
memberships, and nanny and housekeeping services to TeAM; and
allocated, but did not pay, seventy thousand dollars of profits
to plaintiff over several years."). Specifically, Meents
asserts that before his termination on July 31, 2012, Meents
emailed Richard Vogel on July 5, 2012, informing Vogel that he
would like to pursue the sale of his ITI stock and "will need a
method to value [his] stock to an outside investor." (ECF No.
36-10). In this email he also asked for "the last three years
financials, incorporation documents including Articles of
Incorporation and by-laws." (*Id.*). Meents attests that he
subsequently met with Vogel, Tumey, and Russon on July 10, 2012
and "reiterated [his] request for the kind of information [he]

needed to determine the value of [his] ITI shares." (ECF No. 36-2 ¶ 13). Meents avers that at this meeting, nearly twenty (20) days before he was terminated:

> Vogel told [him] not to waste money with an independent appraisal because it was not a good time to sell the shares due to ITI's then pending litigation with KCI. . . . Tumey stated to [Meents] that [he] should just hold onto [his] shares, and Vogel too said this.

(*Id.*). Mr. Vogel corroborated this exchange in his deposition testimony. (ECF No. 36-13, at 25-27). Meents then followed up with another email to Vogel, Tumey, and Russon on July 19, 2012, requesting the same information as in the July 5, 2012 email "so [he] can make a determination on whether or not to pursue the use of an appraiser." (ECF No. 36-11). In the July 19, 2012 email, Meents asked for one additional piece of information, namely the number of shares issued. Meents asserts that he did not receive a response to this email; instead, Russon informed him about his termination on July 31, 2012 while Meents was traveling in Paris. Meents believes that "had the company records been provided to [him] in July 2012, Vogel would have had to disclose that he had awarded himself supposed dividends of $676,000 in 2010 as compared to [his] dividend of $71,500. Yet, the allocation of shares in the shareholders' agreement along with the later legitimate stock transfers that had been made could not justify this amount." (ECF No. 36-2 ¶ 22).

ITI argues that it is entitled to partial summary judgment because ITI successfully established grounds to terminate Meents for cause, thus "the existence of additional grounds for termination are immaterial since, under such circumstances, ITI would have the discretion to choose to terminate Meents either for cause or without cause." (ECF No. 35-1, at 10). Although ITI is correct that the Shareholders Agreement gives ITI the discretion to terminate a shareholder for cause or without cause - thus making any additional termination grounds irrelevant - there is an important distinction in the consequences of each type of termination. The Shareholders Agreement states that "in the event that the Shareholder is terminated without cause, the Company shall be obligated to purchase the Shareholder's share of Stock." (ECF No. 25-5, at 15). In this action, however, ITI is seeking a declaratory judgment that Meents was indeed terminated *for adequate cause* as defined by the Shareholders Agreement, and as such, Meents should be directed to forfeit his shares of ITI stock. (*See* ECF No. 1, at 7). ITI cites *Barisa v. Charitable Research Found., Inc.*, 287 A.2d 679, 682 (Del.Super. 1972), for the proposition that the presence of other motives of the employer for dismissal is immaterial provided sufficient grounds for dismissal exist. *Barisa* is not, of course, binding precedent, but, in any event, the facts of that case are readily distinguishable. In *Barisa*, 287 A.2d at

681, the employee "admitted that he deliberately and knowingly violated the regulations of CRF regarding disposal of surplus property." Although the employee argued that "CRF was motivated by a desire to economize because of financial difficulties rather than by his misconduct when it terminated his employment," the court found that "Barisa's admitted attempts to deceive his employer constituted sufficient grounds for dismissal. An action of an employee . . . showing dishonesty and untrustworthiness, whether the harm to the employer is great or small, will justify his dismissal for cause." *Id.* at 682. Here, however, a genuine factual dispute exists as to whether ITI possessed adequate cause under the Shareholders Agreement to terminate Meents. Thus, ITI's grounds for terminating Meents are quite relevant for purposes of determining whether he was terminated for adequate cause or whether the decision was premised on facts not reasonably believed to be true by the employer.

The analysis in *Schriefer v. Stewart*, 892 F.2d 1041, 1989 WL 156878 (4th Cir. 1989) (unpublished table opinion), is instructive. In that case, the United States Court of Appeals for the Fourth Circuit reversed the trial court's ruling granting summary judgment because there were genuine issues regarding whether there was in fact good cause for plaintiff's termination. Specifically, the court observed:

> The non-performance charged to Schriefer by
> Delta . . . as good cause for its ultimate
> termination of Schriefer related essentially
> to her record of bond forfeitures, bad
> checks, and failure to maintain the 'build-
> up' fund required to protect Delta and
> Dependable against excessive forfeitures.
> But despite undisputed evidence of
> difficulty in these respects, there is also
> conflicting evidence as to *both (1) the
> extent of Schriefer's actual non-performance
> and Delta's resulting financial jeopardy,
> and (2) the extent to which Delta treated
> Schriefer's performance as putting her in
> breach.*

*Id.* at *12 (emphasis added). The court observed that
"[al]though Schriefer's performance under the contract extended
over a two-year period, Delta never asserted any right to
rescind or to cease its own performance because of Schriefer's
conduct until after Schriefer complained to Dependable."
Similarly, although ITI cites Meents's consistently poor
performance as grounds for terminating him for adequate cause,
Vogel testified in his deposition that he did not consider
terminating Meents until Russon brought it to his attention in
July 2012, after Meents already gave his notice of resignation
in April 2012 and attempted to value his shares of ITI stock.
(ECF No. 36-13, at 14).[5]  In *Schriefer*, 1998 WL 156878, at *12,
there was evidence that "Schriefer . . . was terminated only
after she wrote Bolinski, a Dependable official, seeking help in

---

[5] During his deposition, Russon testified that he did not
have the authority to terminate anyone, but only recommended
terminating Meents to Vogel.

getting her $84,000 back from Delta . . . and that her termination quite shortly thereafter by Dependable was at Delta's specific request." Much like in *Schriefer*, the evidence regarding Meents's ongoing poor performance is in substantial conflict. *See id.* ("Although it was Delta's litigation position that Schriefer's non-compliance was substantial and justified both its own non-performance of any obligations owed and its ultimate termination of Schriefer, the deposition testimony of its own officials on this point was ambiguous to the point of outright conflict in some significant details, and was also at odds with that of Dependable's vice-president Bolinski."). In reversing the trial court, the Fourth Circuit concluded that there was a genuine issue regarding whether "Schriefer's build-up funds were sufficient to pay for existing or threatened forfeitures, whether her forfeiture amount was abnormal for bail bond agencies given the precarious nature of the work, and *whether the forfeitures were a pretext for getting rid of Schriefer because she was starting to complain about not having received the services allegedly required under the addendum agreement*." *Id.* at *13 (emphasis added).

The Court of Special Appeals of Maryland undertook a similar analysis in *Himes Assocs, Ltd. v. Anderson*, 178 Md.App. 504 (2008). Much like ITI argues here, plaintiff in *Himes* argued that the trial court "ignored the legal standard

enunciated in *Conte* and assumed the role of super personnel officer." *Id.* at 540. The Court of Special Appeals rejected this argument, finding that the trial judge "did not substitute himself for Himes in the role of employer, by deciding whether Anderson's work actually was poor or whether his behavior in fact was cause for termination." Instead, the court concluded that:

> consistent with the holding in *Conte*, the trial judge examined the motivations underlying Himes's decision to terminate Anderson and assessed whether Paul Himes indeed terminated Anderson for the reasons he was citing as poor performance or cause. The trial judge found that Anderson was not terminated for the reasons Paul Himes and others testified about. . . . [H]e decided as a matter of fact that the reasons cited by Paul Himes for terminating Anderson were not the reasons for which Anderson was terminated, and that, *post hoc*, Himes was *feigning dissatisfaction with Anderson's work*.

*Id.* at 540-41 (emphasis added). Meents propounds arguments in support of his pretext defense to show that he was not terminated for "adequate cause," but because of his impending discovery of allegedly numerous improprieties at ITI and that ITI feigned dissatisfaction *after* Meents resigned and after he inquired about appraising his ITI shares. Although an employer's personnel decisions should not be second-guessed, a court may determine whether an employer terminated an employee for the reasons the employer cites as for cause. *See Jorgensen*

*v. United Commc'ns Grp. Ltd. P'ship*, Action No. 8:10-CV-00429-AW, 2011 WL 3821533, at *7-9 (D.Md. Aug. 25, 2011) ("Given the facts alleged by both parties regarding the investigation into the [employee's] use and possession of propriety information, the [c]ourt finds that a genuine issue of material fact exists regarding whether [d]efendant's termination of [p]laintiff for just cause was made in objective good faith and consistent with a reasonable employer's actions."); *Himes*, 178 Md.App. at 540.

Meents is entitled to challenge ITI's position that he was terminated for adequate cause and thus should forfeit his shares of stock. ITI argues that "if Meents was, as ITI contends, terminated for cause and adequate cause, then the only probative evidence for consideration by the fact finder is the credibility of the facts underlying ITI's decision-making to terminate him." (ECF No. 43-1, at 8). Meents's pretext defense is relevant in assessing ITI's objective motivations for terminating him following his resignation and the credibility of the justifications presented by ITI.[6] Accordingly, Plaintiff's motion for partial summary judgment will be denied.

---

[6] ITI argues that "evidence relating to Meents's affirmative defense is immaterial since it relates to ITI's subjective motivation, rather than its objective motivation." (ECF No. 43-1, at 9). ITI thus concludes that "since Meents's allegations are inconsequential to the determination of whether he was terminated for cause, such evidence is inadmissible as substantive evidence." (*Id.*). Meents puts forth evidence challenging the objective reasonableness of his termination and

23

## B.    ITI's motion for a protective order[7]

ITI asserts that the principal dispute in this declaratory judgment action is whether ITI terminated Meents for adequate cause requiring Meents to forfeit his shares of ITI stock. ITI believes that some of the information Meents seeks in discovery through his requests for admissions and for production of documents is irrelevant to this action and Meents's pretext defense, and instead concerns his shareholder derivative lawsuit currently stayed in the Circuit Court for Montgomery County. ITI cites nineteen (19) requests for admissions by Meents, and two requests for production of documents, which ITI believes concern information which has no bearing on his termination. (*See* ECF No. 21-1, at 7-10). Specifically, ITI objects to the following requests for admissions:[8] (4) the principal office address of Gueritec Holdings, LLC as indicated within Exhibit 20 is the address of a residential property owned by David Tumey; (5) the principal office address of Darion Investments, LLC as

---

whether ITI acted in objective good faith. He will be permitted to rely on such evidence at this time.

[7] Before seeking a protective order, the movant must confer, in good faith, with the other party in an effort to resolve the dispute without judicial intervention. Fed.R.Civ.P. 26(c). ITI's attorneys state that on July 31, 2013, they sent an email to Meents's attorney proposing a "reasonably tailored solution to resolve the potential discovery dispute, which Meents's counsel rejected." (ECF No. 21-1, at 5-6).

[8] The numbering follows ITI's numbering in the motion for a protective order.

indicated within Exhibit 21 is the address of a residential property owned by David Tumey; (6) Vogel is the person who holds the majority of the outstanding membership interests in Gueritec Holdings, LLC; (7) Vogel is the person who holds the majority of the outstanding membership interests of Darion Investments, LLC; (8) Gueritec Holdings, LLC earns income through contractual relationships with Innovative Therapies, Inc.; (9) Tumey and Vogel earn income as a result of the contractual relationship between Gueritec Holdings, LLC and Innovative Therapies, Inc.; (10) Vogel has transferred all or some portion of the shares of stock he owned in Innovative Therapies, Inc. to Darion Investments, LLC; (11) the patent application and patent assignment materials collectively attached as Exhibit 22 . . . were filed with the United States Patent Office at the request of Vogel; (12) the notary stamp bearing the name of Susan M. Sullivan which appears on some of the pages within Exhibit 22 is the notary stamp of the same Susan Sullivan who is identified in paragraph 19 of the complaint fled by Innovative Therapies, Inc. in this lawsuit; (13) Pal (sic) Svedman did not appear before Susan Sullivan on the dates of his purported signatures were placed on any of the materials within Exhibit 22 which purport to bear his signature;[9] (14) Pal (sic) Svedman did not sign any of the materials within Exhibit 22 which purport to bear his

---

[9] Exhibit 22 includes patent documentation.

signature; (15) Meents did not appear before Susan Sullivan on the dates his purported signatures were placed on any of the materials within Exhibit 22 which purport to bear his signature; (16) when Meents was asked to sign those pages within Exhibit 22 which purport to bear his signature, he was only furnished with a signature page; (17) when Bradley D. Yakam signed the page within Exhibit 22 which purports to bear his signature, the document he was requested to sign and return to ITI identified the designated "Assignee" of the Adapter for Portable Negative Pressure Wound Therapy Device as "Innovative Therapies, Inc."; (18) When Edmark M. Litzie signed the pages within Exhibit 22 which purport to bear his signature, the documents he was requested to sign and return to ITI identified the designated "Assignee" as "Innovative Therapies, Inc."; (19) Richard Vogel, or someone acting at his direction, changed the designated "Assignee" of each document that is a part of Exhibit 22 from "Innovative Therapies, Inc." to Richard Vogel after the pages signed by Bradley D. Yakam and Edward M. Litzie were signed by them; (20) Terri Seppala did not sign the document attached as Exhibit 5 to the Motion to Dismiss filed by ITI in this lawsuit;[10] (21) Clive Patrickson did not sign the document

---

[10]  Exhibit 5 to ITI's motion to dismiss Meents's counterclaim is a document entitled "Action by Unanimous Written Consent in Lieu of a Meeting of the Board of Directors of Innovative Therapies, Inc.," issuing 40,000 shares of ITI's

attached as Exhibit 5 to the Motion to Dismiss filed by ITI in this lawsuit; and (22) Richard Vogel did not pay ITI $100,000 in exchange for the shares of stock of ITI referred to in the document attached as Exhibit 5 to the Motion to Dismiss filed by Innovative Therapies, Inc. in this lawsuit. ITI also objects to the following two requests for documents: (28) any and all documents that could have been provided by ITI if it had determined to comply with Meents's July 5, 2012 email to Vogel, in which he requested ITI's last three years financials, incorporation documents, Articles of Incorporation, and by-laws, etc. and anything else that Vogel believed would assist Meents in evaluating Meents's ITI shares; and (30) any and all documents, communications, notes, and/or materials in ITI's possession that refer or relate to ITI's incorporation, the filing of any articles of amendment, that identify the members of its Board of Directors and/or shareholders and/or the number of shares of stock owned by its shareholders at any time. (ECF No. 21-1, at 9-10).

Under Fed.R.Civ.P. 26(b), "parties may obtain discovery regarding any non-privileged matter that is relevant to any party's claim or defense. . . . Relevant information need not be admissible at trial if the discovery appears reasonably

---

Class B voting Common Stock to Vogel in consideration for $100,000.

calculated to lead to the discovery of admissible evidence."[11]
Under Rule 26(b), it is "*relevance* not *admissibility*" that
drives the inquiry as to whether the information is
discoverable. *Herchenroeder v. Johns Hopkins Univ. Applied
Physics Lab.*, 171 F.R.D. 179, 181 (D.Md. 1997) (emphasis in
original). Relevance is not defined by Rule 26(b)(1) but
reference to Fed.R.Evid. 401 is helpful because it defines that
term as "evidence having the tendency to make the existence of
any fact that is of consequence to the determination of the
action more probable or less probable than it would be without
the evidence." The Fourth Circuit has recognized that "[e]ven
assuming that [ ] information is relevant (in the broadest
sense), the simple fact that requested information is
discoverable under Rule 26(a) does not mean that discovery must
be had." *Nicholas v. Wyndham Int'l Inc.*, 373 F.3d 537, 543 (4th
Cir. 2004). Rule 26(b)(2)(C)(iii) requires a court to limit
discovery if "the burden or expense of the proposed discovery
outweighs its likely benefit, considering the needs of the case,
the amount in controversy, the parties' resources, the
importance of the issues at stake in the action, and the
importance of the discovery in resolving the issues." Moreover,
under Rule 26(c)(1), "[t]he court may, for good cause, issue an

---

[11] Rule 36 governs requests for admissions and incorporates
the scope provisions of Rule 26(b)(1).

order to protect a party or person from annoyance, embarrassment, oppression, or undue burden or expense." Fed.R.Civ.P. 26(c)(1). A protective order may forbid inquiry into certain matters, or limit the scope of disclosure or discovery to certain matters. Fed.R.Civ.P. 26(c)(1)(D). The court may restrict the scope of a production request, but it "must be careful not to deprive a party of discovery that is reasonably necessary to afford a fair opportunity to develop and prepare the case." Fed.R.Civ.P. 26 advisory committee's note. The burden is on the movant to establish good cause under Rule 26(c); the movant must set forth specific and particular facts, rather than broad conclusory statements as to why a protective order should issue. *Baron Fin. Corp. v. Natanzon*, 240 F.R.D. 200, 202 (D.Md. 2006). In order to obtain a protective order, the moving party must demonstrate "that the discovery sought lacks relevance to the extent that the likelihood and severity of the harm or injury caused . . . outweighs any need for the information." *Baron*, 240 F.R.D. at 202 (internal quotation marks and citation omitted). Indeed, "even very slight inconvenience may be unreasonable if there is no occasion for the inquiry and it cannot benefit the party making it." Wright, Miller & Marcus, Federal Practice and Procedure: Civil 2d § 2036. Rule 26 "confers broad discretion on the trial court to

decide when a protective order is appropriate and what degree of protection is required." *Id.*

ITI contends that "ITI's relationship to Gueritec Holdings, LLC, Darion Investments, LLC ('Darion'), patent assignments, and ITI's issuance of shares and dividends, relate only to Meents's derivative claims and are immaterial to why ITI fired him." (ECF No. 21-1, at 10). ITI asserts that "the validity or invalidity of Meents's allegations concerning misconduct has absolutely no bearing on Meents's defense to the [t]ermination." (*Id.* at 10-11). Instead, ITI believes that "only Meents's discussions, if any, concerning such allegations, and ITI's actions, if any, in response to Meents's claims of impropriety, are relevant to the [t]ermination." (*Id.* at 11). ITI believes that the burden and expense of answering the nineteen requests for admissions and two requests for production of documents outweighs the benefit of this discovery because Meents's requests relate to his shareholder derivative action and will significantly expand the scope of discovery. Specifically, ITI points out that "[d]iscovery of matters pertaining to Meents's derivative claims, at the very least, would impact numerous ITI employees, every current and former ITI director, every patent assignment, every dividend distribution, each distribution of shares and/or performance units, all licensing agreements, ITI's income and expenses, and

ITI's books and records." (*Id.* at 15). ITI asserts that by agreeing to stay the derivative lawsuit in the Circuit Court for Montgomery County and failing to file an amended counterclaim after the undersigned dismissed it with leave to amend, Meents has "conceded . . . that discovery concerning his derivative claims should be postponed pending resolution of this matter" and he is "precluded from now attempting, through the 'back door' in this Court, to circumvent his prior election." (*Id.* at 13).

ITI's arguments are persuasive as to the requests for admissions. Requests for admissions serve the expedient purpose of eliminating "the necessity of proving essentially undisputed and peripheral issues of fact." *Wigler v. Elec. Data Systs. Corp.*, 108 F.R.D. 204, 205 (D.Md. 1985). Their proper, strategic use saves "time, trouble, and expense" for the court and the litigants. *Metro. Life Ins. Co. v. Carr*, 169 F.Supp. 377, 378 (D.Md. 1959). Here, the information Meents seeks in his requests for admissions largely relates to his shareholder derivative action. The instant litigation concerns, *inter alia*, whether Meents was terminated for adequate cause. In contrast, Meents alleges in the derivative shareholder suit that Vogel breached certain duties by, among other things, "affixing the signature pages Meents and others had signed to patent applications which had the effect of vesting title to these

items of ITI's intellectual property in Vogel, personally."
(ECF No. 21-2, at 67).   Meents also alleges in the state court
action that Vogel set up a company in Florida called Gueritec
Holdings, Inc. and "[a]s a result of his position of authority
with ITI, the company is now paying Gueritec a $150 per unit
licensing fee on a product . . . and to the knowledge of
[Meents], this has generated in excess of $60,000 in licensing
fees for Gueritec." (*Id.* at 69).   Meents believes that "Tumey
has been . . . involved in Vogel's wrongdoing, by at a minimum,
allowing Vogel to utilize Tumey's address in Florida as the
address of Gueritec." (*Id.* at 70).   Meents further alleges that
Vogel has instructed accounting staff to issue compensation to
him in excess of $1 million.   The nineteen requests for
admissions to which ITI objects quite obviously relate to these
allegations.   ITI's argument that "judicial time and resources
would be spared by avoiding unnecessary and potentially
expensive litigation associated with claims for which [Meents's]
standing to pursue were contingent on the results of the instant
proceedings" is persuasive. (ECF No. 21-1, at 15).   *Oppenheimer
Fund, Inc. v. Sanders,* 437 U.S. 340, 353 n.17 (1978) ("when the
purpose of a discovery request is to gather information for use
in proceedings other than the pending suit, discovery properly
is denied.").

Although Meents raises pretext as an affirmative defense in the answer, the information he seeks in the requests for admissions discussed *supra* are outside the scope of the instant dispute. In his answer, Meents identifies the following improprieties that he believes Vogel facilitated: (1) "taking the signature pages that Meents and other[sic] ITI employees had signed to patent applications which were intended to vest title to those patentable items in ITI, and affixing them to applications whose terms vested title to these items of ITI's intellectual properly in Vogel personally"; (2) setting up Gueritec Holdings, Inc., which is wholly owned by Vogel and by using his position of authority with ITI so as to require that ITI pay Gueritec a $150 per unit licensing fee; and (3) instructing ITI's accounting staff to issue compensation to Vogel in excess of $1 million without any financial justification. (ECF No. 7, at 5-6). But notably, Meents does not use these examples to support his pretext defense, but uses them as evidence of "Vogel's oppressive conduct toward the minority shareholders, his breach of the contractual duties owed to ITI, his duties of loyalty and good faith toward ITI, and his duty to refrain from self dealing with respect to the interests of ITI." (*Id.* at 5); *Ralston Purina v. McFarland*, 550 F.2d 967 (4th Cir. 1997) (noting that the information sought must be "germane" to the subject matter). Although the sought after

admissions enumerated *supra* may be germane to Defendant's stayed shareholder derivative suit, which alleges wrongdoing by ITI and Vogel, including improper dividend distributions and patent assignments, it does not appear that this information has the tendency to make the existence of any fact that is of consequence to the determination of *this* declaratory judgment action more probable or less probable than it would be without the evidence. *See, e.g., Equal Rights Center v. Archstone-Smith Trust*, 251 F.R.D. 168, 172 (D.Md. 2008) ("[b]alancing the cost-benefit factors set forth in Fed.R.Civ.P. 26(b)(2)(C)(iii), the court notes that the information sought by NBA . . . is obtainable through a less burdensome and expensive source such as depositions that will likely be done in this case in any event."). In the requests for admissions, Meents appears to seek information to confirm his suspicions of wrongdoing by Vogel and ITI, rather than obtain evidence regarding his termination. As ITI argues, there must be a causal connection between Meents's actual or potential discovery of alleged improprieties and his termination. Evidence of wrongful conduct by ITI or Vogel in and of itself would not support pretext. Considering all of the factors set forth in Fed.R.Civ.P. 26(b)(2)(C)(iii), the burden and expense of having to respond to Defendant's nineteen requests for admissions enumerated above would outweigh the benefit of the information sought in those

requests, which largely pertains to the stayed derivative action. *See Tilley v. United States*, 270 F.Supp.2d 731, 735 (M.D.N.C. 2003) ("if the discovery sought has no bearing on an issue of material fact" – *i.e.*, if it is not relevant – "a protective order is proper.").

ITI's objections to Meents's requests for production of documents are less convincing. As indicated above, ITI believes the following two requests to be irrelevant to the claims asserted in this matter: (1) any and all documents that could have been provided by ITI if it had determined to comply with Meents's July 5, 2012 email to Richard Vogel, in which he requested ITI's last three years financials, incorporation documents, Articles of Incorporation, and by-laws, etc. and anything else that Vogel believed would assist Meents in evaluating Meents's ITI shares; and (2) any and all documents, communications, notes, and/or materials in ITI's possession that refer or relate to ITI's incorporation, the filing of any articles of amendment, that identify the members of its Board of Directors and/or shareholders and/or the number of shares of stock owned by its shareholders at any time. (ECF No. 21-1, at 9-10). As to the first request, the information Meents seeks is relevant given his argument that ITI terminated him in an effort to avoid disclosing information he sought in the July 5 and 19, 2012 emails. Although ITI states in the motion that this

request is irrelevant, it later pronounces that ITI will consent to producing – subject to a consent confidentiality and protective order – the information requested by Meents before his termination, including: (a) copies of ITI's financial statements for 2009, 2010, and 2011; (b) incorporation documents, including the Articles of Incorporation and By-Laws; and (c) total number of ITI shares issued.[12] (ECF No. 21-1, at 12). Accordingly, it is not appropriate to limit discovery to exclude production of this information. The second request appears to capture a document entitled "Unanimous Written Consent [UWC] in Lieu of the Organizational Meeting of the Board of Directors of Innovative Therapies, Inc.," dated October 31, 2007, which ITI included as an exhibit to its motion to dismiss Meents's counterclaim and motion for partial summary judgment. (*See* ECF No. 35-3). ITI points out that "Meents does not claim that he discovered [this document] dated October 31, 2007 prior to his termination. Indeed, Meents has acknowledged that he was unaware of such document until this litigation." (ECF No. 23-1, at 8). ITI also notes that it has "attached the UWC dated

---

[12] Meents asserts that he will "agree to a confidentiality agreement on all documents relating to the financials of the corporation, including, but not limited to those documents he requested in his pre-suit emails of July 5, 2012 and July 19, 2012." (ECF No. 22-1, at 14). Meents further notes that "[t]o the extent any other ITI documents Meents has requested in discovery are truly confidential, there is no problem with appropriate confidentiality provisions." (*Id.*).

October 31, 2007, and other corporate resolutions pertaining to the issuance of ITI shares, to its Motion to Dismiss the Counterclaim in this matter in order to correct misstatements appearing in the Counterclaim." (*Id.* at 9). The fact that ITI seems already to have produced at least some of the documents captured in this second request undermines its position that producing this information would be unduly burdensome or expensive. It also appears that Meents has obtained a list of ITI's shareholders, their respective ownership percentage of shares, and voting shares, as he has submitted this document as an exhibit to his opposition to ITI's motion to modify a subpoena, discussed *infra*. (See ECF No. 25-5). Furthermore, the information sought in the second request appears to relate to Meents's request for "incorporation documents" in the July 5, 2012 email, which he believes prompted his termination. ITI will be directed to respond to the second request as well.

Accordingly, ITI's motion for a protective order will be granted in part to prohibit Meents's inquiries regarding the nineteen requests for admissions enumerated *supra*,[13] but ITI is directed to produce the documents in Meents's requests for production of documents numbered 28 and 30.

---

[13] These requests for admissions are numbered four (4) through twenty-two (22) in ITI's motion for a protective order. (*See* ECF No. 21-1, at 8-9).

## C.   ITI's Motion to Modify A Subpoena

ITI filed a separate motion to modify a subpoena that Meents issued to Bank of America, N.A. (ECF No. 24). Meents served a subpoena on Bank of America, 255 North Washington Street, Rockville MD 20850, requesting that the following documents be produced: (1) "[c]opies of all checks of Innovative Therapies, Inc. operating account, 12 Meem Avenue, Suite C, Gaithersburg, MD 20877 – account no. 001925553110 from the date of May 1, 2010 through July 31, 2010"; and (2) "[c]opies of all bank statements and deposit slips for all accounts of Innovative Therapies, Inc. including, but not limited to operating account – 00192553110 for the period of October 1, 2007 through December 31, 2007." (ECF No. 24-4).[14]

ITI invokes Rules 45(d)(3)(A)(iii) and 45(d)(3)(B)(i).[15] Rule 45(d)(3)(A)(iii) requires a court to quash or modify a subpoena that "requires disclosure of privileged or other

---

[14] Meents states that "Bank of America has informed Meents' counsel that the documents are ready for delivery, but they are withholding the delivery of the documents pending the court's ruling on [ITI's] motion." (ECF No. 25-1, at 5 n.5).

[15] As of December 1, 2013, amendments to the Federal Rules of Civil Procedure took effect, including changes to Rule 45. The amendments recodified the former Rule 45(c)(3)(A)(iii) as the present Rule 45(d)(3)(A)(iii) and the former Rule 45(c)(B)(i) as the present Rule 45(d)(3)(B)(i).

protected matter, if no exception or waiver applies."[16]   Rule

45(d)(3)(B)(i) permits, but does not require, a court to quash

or modify a subpoena if it requires disclosure of "a trade

secret or other confidential research, development, or

commercial information."   There is "no absolute privilege for

trade secrets and similar confidential information."  *Gonzales*

*v. Google, Inc.*, 234 F.R.D. 674, 685 (N.D.Cal. 2006) (*quoting*

*Centurion Indus., Inc. v. Warren Steurer & Assoc.*, 665 F.2d 323,

325 (10th Cir. 1981).   "Trade secret or commercially sensitive

information must be 'important proprietary information' and the

party challenging the subpoena must make 'a strong showing that

it has historically sought to maintain the confidentiality of

this information."  *Gonzales*, 234 F.R.D. at 684 (*quoting Compaq*

*Computer Corp. v. Packard Bell Elec., Inc.*, 163 F.R.D. 329, 338

(N.D.Cal. 1995)); *Deman Data Systs., LLC v. Schessel*, No. 4:13-

mc-00520, 2014 WL 204248, at *2 (M.D.Pa. Jan. 16, 2014) ("[t]he

party resisting discovery must first establish that the

information is a trade secret and that its disclosure would be

harmful.").   The burden then shifts to the requesting party to

demonstrate the information's relevance and necessity.  *Id.*   If

---

[16] "Although Rule 45(c) sets forth additional grounds on
which a subpoena against a third party may quashed[,] . . .
those factors are co-extensive with the general rules governing
all discovery that are set forth in Rule 26."  *HDSherer LLC v.*
*Natural Molecular Testing Corp.*, Civil Action No. 2:13-cv-561-
PMD, 2013 WL 4427813, at *2 (D.S.C. July 31, 2013).

the information is relevant and necessary, the court must balance the requesting party's need for disclosure against the resisting party's potential for injury. *Procter & Gamble Co. v. Be Well Mktg., Inc.*, 12-mc-392, 2013 WL 152801, at *2 (M.D.Pa. Jan. 15, 2013). "Typically, courts, [having broad discretion in controlling discovery,] will balance the parties' interests by entering a protective order limiting disclosure of trade secrets to counsel or the parties." *Id.*

ITI contends that with the exception of Check No. 3000, issued on June 2, 2010 – which Meents is accused of having a subordinate forge - the remaining bank records sought "have absolutely no bearing on the issue of whether Meents was terminated for cause, and Meents has failed to articulate any causal nexus between the requested confidential records and Meents's termination." (ECF No. 24-1, at 4). ITI takes the position that because it has not alleged that Meents was involved in any other improper conduct involving its operating account between May 1, 2010 and July 31, 2010, these other checks should not be produced. Meents counters that he was not informed of the forgery allegation until he received the termination letter on July 30, 2012, over two years after the alleged event took place. Meents states that he "was unaware of the company's alleged concern until then, and he did not have the opportunity to review the check at issue until discovery in

this case. . . . As a result, he has little, if any memory of the purported event or the company's banking practices at the time." (ECF No. 25-1, at 2). Meents believes that a review of the checks from May 1, 2010 through July 31, 2010 – a ninety day period – "is important, as the deposition testimony of [ITI's] employees has been inconsistent regarding the circumstances surrounding the very issuance of this check, the alleged date when Mr. Vogel was told about it, the circumstances in which he was told, and the motive for Susan Sullivan in either violating ITI's procedures for the issuance of checks at the time or perhaps fabricating testimony in connection with this lawsuit." (*Id.*).[17] Meents seeks checks from the May 2010 through July 2010 time period to "test whether the check was even a forgery of Larry Jones' signature"; "test whether the issuance of other checks followed procedures testified to by Mr. Vogel and whether the procedure for the issuance of checks was followed on a regular and routine basis or whether there were numerous variations from the company procedure"; "to verify whether Susan Sullivan signed Larry Jones' name on other checks written during that time frame"; and "to otherwise determine whether ITI

---

[17] Meents further argues that the forgery allegation appears inconsistent with an email from Susan Sullivan to Richard Vogel on June 2, 2010, stating that "we issued check number 3000 to Alex Bush for $5,000.00 for the office furniture and wiring." (ECF No. 25-2). Meents believes this email indicates that the check was issued in the ordinary course of business.

deviated from the protocol testified by Richard Vogel or Susan Sullivan relating to the signatures on ITI checks." (*Id.* at 3).

Meents offers sound reasons for requesting checks from May 1, 2010 through July 31, 2010, especially given that ITI cites the alleged check forgery as a reason for terminating Meents and this dispute centers on whether Meents was terminated for adequate cause. Specifically, in the July 31, 2012 termination letter to Meents, ITI stated that he was being terminated for his consistently poor performance and for "knowingly ordering a subordinate to forge the Corporate Controller's signature on a check." (ECF No. 24-2, at 2). Moreover, ITI has not made a strong showing that it has historically sought to maintain the confidentiality of this information. ITI's conclusory statement that "ITI's financial records are confidential and the release of such records subjects ITI to annoyance, embarrassment, and oppression" is self-serving and insufficient. (ECF No. 24-1, at 4).[18] In any event, Meents has demonstrated the importance and

---

[18] Plaintiff's arguments regarding Md. Code, Fin. Inst., § 1-302(1) are unpersuasive. Section 1-302 prohibits a fiduciary institution, its officers, employees, agents, and directors from disclosing "to any person any financial record relating to a customer of the institution unless: (i) the customer has authorized the disclosure to that person." Plaintiff fails to recognize that Section 1-304(b) describes the procedure by which a bank *may* disclose customer records when served with a subpoena. Specifically, Section 1-304(b) states that:

> [a] fiduciary institution may disclose or
> produce financial records or information

relevance of the checks from the May 1, 2010 through July 31, 2010 time period. To address ITI's confidentiality concerns, the appropriate remedy would be a confidentiality stipulation limiting use of the information, rather than preventing its production altogether. *See In re Madison Williams & Co., LLC*, Case No. 11-15896, 2014 WL 56070 (Bkrtcy.S.D.N.Y. Jan. 7, 2014); *Tessera, Inc. v. Micron technology, Inc.,* No. C-06-80024-MISC-JW (PVT), 2006 WL 733498, at *8 (N.D. Cal. Mar. 22, 2006) (ordering documents produced with the designation, "Confidential – Outside Attorney Eyes Only"). Meents has indicated that as ITI's former COO, "he would have been privy to the company's typical expenditures, . . . so there is no concern that information which was previously treated confidentially with respect to him would be disclosed." (ECF No. 25-1, at 6). Accordingly, ITI's motion to modify the subpoena requesting "[c]opies of all checks of Innovative Therapies, Inc. operating account, 12 Meem Avenue,

---

> derived from financial records in compliance with a subpoena served on the fiduciary institution, if:
> (1) the [t]he subpoena contains a certification that a copy of the subpoena has been served on the person whose records are sought by the party seeking the disclosure or production of the records.

Here, the subpoena includes this certification from Meents's attorneys. It further states that "the law firm of Levin and Gann, representing Innovative Therapies, Inc., shall be provided with a complete set of the documents produced in response to subpoena." (ECF No. 24-4, at 2).

43

Suite C, Gaithersburg, MD 20877 – account no. 001925553110 from the date of May 1, 2010 through July 31, 2010" will be denied.

Meents's subpoena for copies of all bank statements and deposit slips for all ITI accounts between October 1, 2007 through December 31, 2007 warrants a different conclusion. ITI points out that:

> [t]his request apparently relates to Meents's suggestion that the Unanimous Written Consent in Lieu of the Organizational Meeting of the Board of Directors of Innovative Therapies, Inc., dated October 31, 2007 [] is invalid. . . . Specifically, Meents apparently seeks information pertaining to Vogel's investment of $100,000.00.

(ECF No. 24-1, at 3). As discussed *supra*, Meents acknowledged that he was unaware of the UWC until the instant litigation, and this document appears irrelevant to his pretext defense. Subpoenas must seek only information that is not "otherwise procurable by exercise of due diligence" and not overbroad. *United States v. McDonald*, 444 F.App'x 710, 711 (4th Cir. 2011) (*citing United States v. Nixon*, 418 U.S. 683, 699-700 (1974)). A subpoena is overbroad if it "does not limit the documents requested to subject matter relevant to the claims or defenses." *In re Subpoena Duces Tecum to AOL, LLC*, 550 F.Supp.2d 606, 612 (E.D.Va. 2008). Copies of ITI's bank statements and deposit slips nearly five years preceding his termination is more akin to a fishing expedition than inquiry into documents supporting

44

Meents's defenses.   Meents cannot demonstrate how copies of all bank statements and deposit slips of ITI from October 1, 2007 through December 31, 2007 would assist him in his defense. Accordingly, the subpoena will be quashed to the extent it seeks this information.

**D.   Meents's Motion to Extend Discovery**

On October 24, 2013, one day before the close of discovery deadline pursuant to the scheduling order (ECF No. 19), Meents filed a motion to extend the discovery deadline by sixty (60) days. (ECF No. 27).

Meents's request implicates Fed.R.Civ.P. 16(b), which provides that "[a] schedule may be modified only for good cause and with the judge's consent."  District courts have broad discretion to manage the timing of discovery, *Ardrey v. United Parcel Service*, 798 F.2d 679, 682 (4th Cir. 1986), *cert. denied*, 480 U.S. 934 (1987), and the only formal limitation on this discretion with respect to consideration of motions to amend scheduling orders is that the moving party demonstrate good cause.  Fed.R.Civ.P. 16(b)(4).  "Good cause" is shown when the moving party demonstrates that the scheduling order deadlines cannot be met despite its diligent efforts. *Potomac Elec. Power Co. v. Elec. Motor Supply, Inc.*, 190 F.R.D. 372, 275 (D.Md. 1999) (*quoting Dilmar Oil Co., Inc. v. Federated Mut. Ins. Co.*, 986 F.Supp. 959, 980 (D.S.C. 1997), *aff'd by unpublished*

*opinion*, 129 F.3d 116 (Table), 1997 WL 702267 (4th Cir. 1997)).
Lack of diligence and carelessness are the "hallmarks of failure
to meet the good cause standard." *W.Va. Hous. Dev. Fund v.
Ocwen Tech. Xchange, Inc.*, 200 F.R.D. 564, 567 (S.D.W.Va. 2001).
"If [the moving] party was not diligent, the inquiry should
end." *Marcum v. Zimmer*, 163 F.R.D. 250, 254 (S.D.W.Va. 1995).
Because a court's scheduling order "is not a frivolous piece of
paper, idly entered, which can be cavalierly disregarded by
counsel without peril," *Potomac Elec. Power Co.*, 190 F.R.D. at
375, a movant must demonstrate that the reasons for the
tardiness of this motion – having been filed one day prior to
the October 25, 2013 discovery deadline – justify a departure
from the deadlines set by the scheduling order.

On June 12, 2013, the court issued a scheduling order which
set October 25, 2013 as the deadline for completing discovery.
(ECF No. 19). Meents asserts that he needs additional discovery
for two reasons. First, Meents argues that if ITI's motions for
a protective order and to quash a subpoena are denied, "a review
of the newly produced materials may lead [Meents] to have a
reasonable basis to pursue follow up discovery that he had not
previously been in a position to evaluate or even consider."
(ECF No. 27-1, at 2). Second, Meents asserts that he recently
discovered that certain documents pertaining to a different
litigation in which Plaintiff was a party may be relevant to the

claims in this case.   Meents asserts that in answering one of his interrogatories, ITI stated that one of Meents's failures "was that he independently determined in 2007 that ITI needed to have a company known as Microcom Design, Inc. manufacture a large number of units of ITI's main product (known as the Svedman Wound Care device) for sale in 2007, but Defendant Meents' failures resulted in insufficient sales, and he left ITI with a huge loss by the end of that calendar." (*Id.*).   Meents asserts that ITI took a different position in the *Microcom* litigation.   He avers that:

> after the completion of the depositions of Vogel and Tumey counsel found an opportunity to review the Microcom case file. . . . Upon that review, it became apparent that there were snippets of depositions taken of Vogel and Tumey in that case that were filed as exhibits, and that it would be wholly appropriate to obtain discovery of the full depositions of those ITI employees and ITI's experts in the Microcom case, along with ITI's answers to interrogatories.

(*Id.* at 3).   Meents intends to use this material to attack the witnesses' credibility.

Discovery will be extended by twenty-one (21) days from the date of this memorandum opinion and order for the limited purpose of allowing ITI to produce the documents discussed *supra* and the Bank to comply with the subpoena to the extent indicated in this memorandum opinion.   Meents has stated that Bank of America, N.A. has the documents ready for delivery, thus twenty-

one (21) days to receive the applicable checks should be more than sufficient. Although Meents asserts that a review of this newly produced information may require additional discovery, this is unpersuasive. *See Storrs v. Allen*, 2010 WL 1817838, at *4 (D.Md. May 6, 2010) (denying request to extend deadline to complete discovery where [p]laintiff did not clearly explain or provide a sufficient proffer as to how any information discovered . . . would support any of his claims."). ITI informs that it has produced more than 16,000 pages of documents and defense counsel has taken five (5) depositions, collectively lasting more than twenty-five (25) hours. (ECF No. 31-1, at 2). Because Meents will be prohibited from inquiring about requests for admissions numbered 4-22 for the reasons stated above, any arguments that responses to these admissions would lead to additional discovery are now moot.[19]

---

[19] ITI argues that Meents should have moved to compel production of documents pursuant to Fed.R.Civ.P. 37(a)(3)(B) and Local Rule 104.8 or to determine the sufficiency of ITI's objections to Meents's Requests for Admissions during the discovery period. ITI served its response to Meents's request for admissions and response to first request for production of documents on July 26, 2013 and August 2, 2013, respectively. Shortly thereafter, ITI moved for a protective order on August 7, 2013, and to modify a subpoena on September 30, 2013. Given that ITI took the position in the motion for a protective order that discovery should be limited to the documents Meents requested in his July 2012 email to Vogel, ITI's argument that Meents erred by failing to move to compel the production of documents ITI refused to produce is unpersuasive. Presumably, Meents was awaiting the undersigned's decision on these two

Moreover, Meents's request to extend discovery will be denied to the extent he seeks additional time to obtain documents concerning the *Microcom* litigation. First, Meents's attorneys cannot demonstrate good cause for seeking such information at this late stage of the litigation. ITI avers that on October 21, 2013, four days before the close of discovery, Meents's counsel submitted a subpoena to Plaintiff to "review and produce thousands of pages of documents concerning a prior matter involving ITI, *Microcom Design, Inc. v. Innovative Therapies, Inc.*, Case No. 317375V." (ECF No. 31-1, at 2-3). Meents's attorneys acknowledge in the motion for an extension of time that "[w]hile counsel knew that Microcom sued ITI in Baltimore County for nonpayment of ITI's 2007 product order, the case did not seem to be particularly relevant." (ECF No. 27-1, at 2). Meents's attorneys further admit that "until preparing for the deposition of ITI officers . . . a little more than a month ago, counsel did not appreciate that these two individuals were going to vehemently blame Meents for these 2007 losses." *Id.* The record does not support Defendant's position. On July 31, 2013, almost three months before the discovery deadline, ITI served Meents with its responses to his interrogatories, one of which asked to describe each action by Meents that placed ITI in

pending motions, determining which documents fell within the scope of discovery.

financial distress. In response, ITI discussed Meents's alleged shortcomings which contributed to the *Microcom* litigation. ITI also stated that Meents was an active participant in the *Microcom* litigation. Thus any claims of ignorance regarding its potential relevance are disingenuous.

Furthermore, even assuming defense counsel was unaware of the alleged relevance of ITI's position in the *Microcom* litigation to the instant dispute, Tumey and Vogel were deposed on September 25 and 26, 2013, respectively. (See ECF Nos. 36-13 & 36-23). The decision to wait until October 21, 2013 to subpoena ITI's counsel for the documents from the *Microcom* litigation - nearly one month after the depositions - can only be attributed to a lack of diligence. The fact that Meents believes discovery from that litigation is relevant here is immaterial. As the undersigned explained in *Dent v. Montgomery Cnty. Police Dep't*, Civil Action No. DKC 08-0886, 2011 WL 232034, at *2 (D.Md. Jan. 24, 2011):

> The standard for permitting modifications to the scheduling order is not whether the discovery sought is relevant and would aid resolution of the factual issues at trial. The question before the court is whether Plaintiff has shown that despite her counsel's diligence and good faith efforts the discovery deadlines could not be met and that there is a good cause to permit additional discovery at this late stage in the litigation.

In any event, ITI states in the opposition that "ITI did not terminate Meents because he over-ordered Svedmans in 2007. Meents's early performance failures, including his overbuilding of ITI's assets, albeit relevant to Meents's first demotion from Chief Operating Officer to Vice President of Marketing, was *not* a basis for his termination." (ECF No. 21-1, at 7). Accordingly, even if defense counsel could demonstrate good cause for the late inquiry, any discovery on this issue would not aid in the resolution of this matter. Based on the foregoing, the motion to extend discovery will be granted to permit the production of documents in accordance with the undersigned's directives discussed *supra*. Discovery will be extended by twenty-one (21) days from the date of this memorandum opinion.

## III. Conclusion

For the foregoing reasons, ITI's motion for partial summary judgment will be denied. ITI's motions for a protective order and to modify a subpoena will be granted in part. Meents's motion to extend the discovery deadline will be granted in part. A separate order will follow.

/s/
DEBORAH K. CHASANOW
United States District Judge
